Please call the next case. 215-1206 R & D Thiel v. Eddie McGinnis Good morning, Honorable Justices and Mr. Kanigan. May it please the Court, I'm Robert Newman for the plaintiff, R & D Thiel. Our first issue is the average weekly wage. Claimant, Mr. McGinnis, was a carpenter building new houses. In the 52 weeks prior to his occurrence of injury, his annual earnings were $61,067.68, and he worked 1,664 hours. This was shown on Respond-Exhibit 1. In figuring the average weekly wage, then, it's either the first or the second method of Section 10 of the Act that applies. Mr. McGinnis had payments in each and every one of the 52 weeks prior to the occurrence, even though he said he took a week off for hunting and then another week off in the summer for rest. The weeks apparently didn't coincide with the pay periods, but the fact that he'd taken off 10 days deliberately doesn't count as days lost. The Commission used the second method. Do we all agree with that? The Commission used the second method. Well, they tried. They tried to. Maybe they tried to, because what they did was they took the 1,664 hours and divided it by 8. Which they can't do unless they're using the third method. Right, exactly. We know that. The question is, is there any evidence in the record that this man actually missed five days' work? My argument is they didn't really testify that he missed five days of work because of the fact that he testified that he worked many days of less than eight hours. Here, I think this case, if you really want to zero in on this case, this case is a burden case. In order to use the second method, there has to be proof in the record that this man missed five work days. Is that correct? Yes. All of the records in this case are in hours only. There are no records kept on how many actual days the man worked. There are hours, but no days. So if there are no, if there's no evidence, if it can't be pointed to, that there's evidence that he missed five days, then you've got to use the first method, which is divide by 52. If there is evidence that he worked five days, then the commission got it right, or missed five days, and they used the second method. So the whole question is, whose burden was it to establish that he missed five days? Well, I think it's the petitioner's burden to prove every element of his case, including his average weekly wage. So if the petitioner below, that is the claimant in this court, wishes to use the second method, then it's the claimant's burden to show when he missed the five days that would be deducted, five or more days that would be deducted from the divisor of 52 used in the average weekly wage calculation. And the claimant didn't do that, so we're left with applying method one, which is take the annual and divide by 52. You get the $1,174.38. Yes, that's it in a nutshell on that issue. So if we were to accede to your argument, it would have to be the commission would have to remand it for the recalculation, correct? You could remand it, yes. With direction to recalculate all the benefits based on $1,174.38 is the average weekly wage, yes, sir. With respect to the temporary total, at the outset after the individual was injured, for the period from December 9, 2006 to March 5, 2007, he was awarded temporary total disability, even though Mr. McGinnis testified that he worked and was paid light duty during the period. That's at page 98 in the arbitration transcript. And also the respondent's records, which was exhibit three, showed that he worked and was paid at least through February 17, 2007, and then he missed from February 17 to March 5 to get over a cold so that he could have his surgery. And he did have the surgery on March 6, 2007. That's the date that the respondent, the employer, picked up the TTD. And so I'm asking this court to order the commission to correct the number of weeks of TTD to 129, just because of the fact that there's no contrary evidence during this first period of time after the occurrence. Mr. McGinnis did work light duty, and he was paid for it, so therefore it wasn't in capacity to work at that time. With respect to the temporary partial, now, Mr. McGinnis did have two periods of temporary partial disability. They totaled 72 weeks in all. Now, according to the average weekly wage, if the, excuse me, the temporary partial definition is that the commission must find the average amount the claimant could have made in the performance of his job if he was working in his original job. Now, our record on this man showed that in the 52 weeks prior to the occurrence, he made $1,664 divided by 52. He actually averaged 32 hours per week and the $1,174.38 in earnings. So in the 72 weeks, he could have made $84,555.36. And in the same 72 weeks, he actually made $66,605.98 in wages. So the difference is $17,949, and two-thirds of the difference is $11,966.23. Now, the employer had made advances on this category of benefits. They had actually made three advances in 2009 totaling $27,711.64. So they'd really overpaid this benefit. The commission had a different formula. The commission said take the $1,467 average weekly wage that they calculated and figure out the amount that the claimant could have earned based on that in the 72 weeks. So the commission didn't do this calculation. But if you do the multiplication, it's $105,793.84. And then if you deduct the amount actually earned of $66,605.98, the difference is $39,087.86. But, of course, the rate is two-thirds of the difference. So the amount that the employer would have owed for the period was $26,058.57. And the advances paid in 2009 actually exceeded that. The commission never did this calculation. And they awarded penalties on the imagined shortfall in these temporary partial benefits. But if you give the respondent credit for the amounts they actually paid, then they overpaid the amount. And in this passage, I've not even mentioned the advance of $5,194 paid in October of 2011. If you only count the advances paid in 2009, then the employer overpaid this temporary partial category. Therefore, I think it's unfair certainly for the 19K penalties and Section 16 attorney's fees to be applied. And also, the employer was being reasonable. They weren't being vexatious. They weren't carrying on litigation for the purpose of delay. They did pay these benefits. Certainly, there was some controversy between the claimant and the employer about whether the benefits were due and the amounts due, but payments were made to resolve this two years before the trial, which was in November 2011. So if you just give the employer credit for the amounts that they actually paid on, then there's no, then there should be no penalties. So did they actually make the payments that you're contending you're entitled to credit for on total permanent disability, or did they make it for other benefits? Okay, so they made one payment for the, that was designated as temporary partial, which was the $20,711.64. They made a payment of $2,000 that was just general, no specific category, but just a general advance payment so that the claimant would have something. The $5,194 in October of 11 was, again, a general payment. There was a $5,000 payment made in August of 2009, which was designated for permanent partial. But then this individual was never awarded any permanent partial. The commission went on to permanent total. So it has to be a benefit, it has to be credited in some category. So let me move on, if I can, to the permanent total disability. This individual was awarded permanent total disability. Now, there's no medical opinion to say he's a permanent total disability candidate. He did a job search, but I am arguing it's not really diligent and unsuccessful. He had only about 16 in-person contacts over about a two- to three-month period. Don't want to be critical of this gentleman, but it really doesn't qualify as a diligent but unsuccessful search. Odd lot, he's about 62 years of age, restrictions by Dr. Hall to about five pounds lifting. He'd been a carpenter his entire working life. His education was freshman of high school. And he did take some testing where he graded about fourth grade in reading and math. So maybe you could say he does qualify as an odd lot candidate. However, if a person does qualify as an odd lot candidate, then the employer can refute that by evidence. And we did have the evidence of Mr. Stephan and Bigelow, both rehabilitation professionals, who opined that Mr. McGinnis could be employed in a capacity such as security monitor in a store or a cashier or greeter or in light assembly type work. So Mr. Stephan's testimony responds to 12, pages 28 through 30. Mr. Bigelow on arbitration, similarly, page C, 273 in the record and arbitration record 113. Then the employer offered to follow through with placement efforts. So with those, I think the permanent toll. Did your own guy, Stephan, admit in light of his age and other characteristics, this man was not a candidate for long-term job training? Long-term job training, yes. And finally, there was no real evidence of any stable market for his skills. Well, Mr. Bigelow and Mr. Stephan said that he could be employed as a security monitor, cashier. Which may be employable, and it was contingent upon the anticipated results of an interest and aptitude test. Well, they did the interest and aptitude test, and the next phase would be moving on to the placement, which is what we were advocating at the time. But there's no question Belmonte said that he's, and that's who the commission relied on. Belmonte at first said that he recommended. The country's advanced states together with limited education, literacy, and transferable skills rendered him unemployable in any job market. That was Belmonte's second opinion. His first opinion was that he thought that Mr. McGinnis should be rehabilitated and placed. His second opinion was that he was totally unemployable, and the commission said that they gave credit to him. They considered him credible and persuasive. Yes, even though he was changing his own opinion and refuting himself. That's their decision, not ours. And Bigelow and Stephan testified that the individual was employable. So I think that's why we're arguing the manifest way. The evidence would be with Stephan and Bigelow to the effect that this individual would be employable. On your issue relating to Dr. Hall's bill, I noticed you cited absolutely no authority for the proposition that because the medical bills lacked a current procedural terminology code, it would be impossible for you to calculate the fee amount and, therefore, it shouldn't have been awarded. You didn't cite any cases that support that proposition. Why shouldn't we hold it forfeited? The authority for that is the statute itself, Section 8.2, which does require the CPT codes. The other point about the medical bills is that the bills that were offered intended to evidence by the claimant were somewhat old by the time that we had the trial in November of 2011. And our record responds, excuse me, I'm not remembering the number, I think it's nine, showed that many payments had been made. We paid over $17,000 to Dr. Elstrom and Hall after the bill had been written that was entered into evidence. And the other bill, the EMPI bill, had been fully paid in August of 2011. The bill that was entered into evidence was in May of 2011. So at least if the commission would have granted credit for the payments that the record showed were actually made, we wouldn't have a medical cost element to this award. The bills were really paid. And, again, the citation of authority we did mention in the brief 8.2, Section 8.2 of the statute, which is where the requirement is written. You cite no authority for the proposition if the requirement isn't complied with, it gets disallowed. And that's your argument, is it not? I'm sorry, I didn't understand the question. I mean, the arbitrator concluded that the medical bills submitted were reasonable, necessary, and plausibly related to the work injury in order to pay it. And you cite no cases for the authority if they forget to put this code in the medical bill that they don't get paid for it. It says they're supposed to be there, but there's no penalty in there for them not being there. The real question in medical bills is, is it reasonable, necessary, and causally related, isn't it? You should pay them if they are. Okay. So my first point on the bills is that actually the Respondent did pay them. They did pay them. They paid them subsequent to the date when the bills tendered into evidence by the petitioner were written. So they did make payments. They made many payments to Alstrom and Hall more recent than the date when the bill submitted into evidence was printed. I looked at the payments, and the payments that you're talking about do not appear to correspond to the charges submitted by Dr. Hill. If you take a look at your payments and match them up against his bills, they don't correspond. And there's no basis to make a determination as to what actually you paid for and what you didn't pay for. And so now the question becomes, how do we disturb what the arbitration commission did? Well, there was over $17,000 paid to Alstrom and Hall after the date of the bill, after the date of the bill that counsel for the claimant entered into evidence. They did some more service after the date of the bill, so the bill showed about $8,000 due, I believe, and they had actually made $17,000 more in payments. Mr. Newman, your time is up. You'll have time in your clock. Thank you. Counsel, you may respond. Thank you, Justice. Good morning, counsel. My name is Richard Hannigan, and I represent Mr. McGinnis. I find it more than interesting that when we asked for the payroll records for the year preceding the injury, the appellant could only produce documentation in the format of hours worked. Respondent Exhibit 1 shows that the petitioner had five weeks where he worked 40 hours, 19 weeks where he worked 32 hours. Mr. Hannigan, that's not the real issue. The issue is where is the proof he missed five days? Nobody even bothered to ask him that. We asked him. He testified that he would show up at work and would be sent home. No doubt about it, but nobody bothered to ask him how many days that happened. That's because he doesn't know. Well, who's got the burden of proof? We do. And you've got hours only. You can't use hours for a number two calculation. Right. I disagree. Well, where? In what case? Greeney specifically says you can't do it. You can use it for a third method calculation. But you can't use it for a number two calculation. Number two calculation. Somebody has got to say I missed five days of work. And if you look at the way he testified, some days he didn't work eight hours. He worked a couple hours here, a couple hours there. But as long as he works on the day, it don't count. Right. So then can the commission draw the inference that for five weeks he missed eight hours? He was allowed to only work eight-hour days. He was only allowed to work 40-hour weeks. He worked five 40-hour weeks. He worked five 24-hour weeks, 19 32-hour weeks. But the problem is he testified there were days he would come to work and he'd be sent home early. That's absolutely correct. So we don't know on the 24-hour weeks whether he worked five days or he didn't. For the 23-hour weeks, he worked between 20 and 39 hours. Well, so the question is, did he miss a day of work or did he only miss hours in a day? No. He testified that he missed days of work. But we don't know how many. No, we don't. And we never will unless they produce it. And that's the problem when you have someone who is illiterate. He's not going to make it up. He just doesn't know. Now, we understand that, but can you change the rules because he's illiterate? I mean, the rules are somebody has a burden. And he has a burden of proving every element of his claim. And if he's talking about average weekly wage, part of that is proving how many days of work he missed to enable him to make use of the second method of calculation. And, I mean, I looked at this record from one end to the other. I cannot find a single thing that would allow you to draw the inference he actually missed five days of work. But the commission did draw that inference. And I think they drew it because when you look at 29 of the weeks, there were eight-hour increments. And we know that he did not work full day. He would show up at work and then go home. But he didn't work. Now, from the day after the injury, when we try this case, field changed their method of keeping track of his work schedule. When he's on light duty, we now have timesheets that show the days worked and the hours worked in those days. We asked for the payroll records for the period before that. We got the payroll records that only showed hours. When we come to try the case, they have payroll records when he's on light duty that show during, like, and we don't necessarily agree, but from December 6, 2006 through February 15, 2007, he missed eight full days of work. This is Respondent's Exhibit No. 4. Now, they say that they only had payroll records that showed hours worked before, as of the date of the accident for the year preceding the injury. Yet they produced payroll records after the date of the injury. Now, you take that into consideration. We may have the burden of proof, but who has the ability to prove it when we ask for the payroll records and they only tell us we've got hours worked? And yet they offer exhibits that show day and hours worked and the days that were missed. So your assertion would be that if you show that there were however many weeks, 20 weeks, that he worked as little as 24 hours or 32, the commission can infer from that that he must have missed at least five days? Is that? Oh, absolutely. Okay. Absolutely. How do they infer that if he goes home early without working a full eight-hour workday? Well, that's easily encompassed within the 23 weeks where he worked between 20 and 39 hours. Why? If you work five days a week and you work 29 hours, divide that by five and you work five short days. And you haven't come up with a situation. If the guy only worked one hour in a week, you could infer that he missed four days' work. But if he works five hours in a week, how do you infer he missed any days? He could have worked one hour a day. Well, no, he can't. Because let's say with the 19 weeks where he missed, where he only worked 32 hours a week. So you can't take these 32 hours and pack them in to the 19, the eight hours that he missed, pack them into the 19 hours. I don't understand what you're saying. So we know that for 19 weeks, he missed eight hours each week. How do we know that? Because of Petitioner's Respondent Exhibit Number 1. It says he worked 32 hours. Eight hours in a week. Right. We've got 19 weeks. So you're going to say because he missed eight hours, he must have missed a day of work. That's what the commission inferred, yes. Except for one problem. They can't do that. If he could have missed two hours on one day or three hours on one day and one hour each of the other days, he would have worked all five days. He just missed eight hours' worth of work. And in that particular case, he's not entitled to that calculation. And Ricketts' case says the burden of proving the number of days missed to determine average weekly wage rests with the Petitioner. Correct. So all he had to do was say I missed five days' work. That's all he had to say. He wasn't going to say that.  I know. He wasn't going to say that. Well, here's the tension going down here, if I could just interject. You're saying there's no realistic way for us to be able to prove this, given the information that we can bring forward. Correct? You're saying that the record, we can't establish it in terms of days. Right? You're saying we just can't do that. Well, I... The client isn't going to testify to that, and there's no other method to prove it definitively. Right? Yes. Okay. So let's assume it's true. And you've exhausted every reasonable ability to do that. I believe I did. Right. Does that change the law? I mean, if the statute says you've got to prove it in terms of five or more days off, and you can't prove it, what do we do? Do we twist the statute? No, you're not twisting the statute. But if you look at the totality of the exhibits the Respondent offered in number one and number four, we know that he missed eight-hour increments when we look at four. Is it illogical to assume that this all changed magically on the day that he was injured, that the work offered, the work available, the weather issues, dramatically changed the day after the accident where he started missing full days? Does the commission have that ability to then infer from the facts that he lost more than five days' work before that? That's the issue. I dealt with it. I have to deal with it. I can only give it to you and live with what you decide. I mean, the troubling part for me here is you're telling us that there were over 20 weeks that he only worked between 20 and 32 hours or something like that. You know, but he can't say that he missed five whole days out of that. He must have worked a lot of partial days. Yes, he did. Okay. Well, that's it. Yes, he did. Therein lies the problem. Yes, it is. I mean, five is not very many out of 20 weeks. So, you know, the facts are what they are. If you read the transcript, Justice, you'll see there was quite a bit of frustration on the part of everyone. Okay. Let me move on. Penalties. Temporary partial disability. No one says that it's based upon what their average hours were before the injury. I believe it is the gross average weekly wage at the time of the injury minus the net amount earned. And that's what we based it upon. We sent them their own payroll records requesting the money. We began. It took 26 weeks before they made their first initial payment of $20,711. When there's an issue of penalties, they have the burden of explaining it away. We made the demand. They did not respond. The only time there was a response was when they did their proposed findings. When then all of a sudden they're trying to take a credit. If they never mention the amount of money that was awarded on permanent partial disability from the date of trial or the date that he was found to be totally disabled in January to the date of trial in November. So certainly I believe the 19L, the late fee, is locked in. As far as the amount of the petition or the amount of the wage loss differential, well, that's a moving target. Because that all depends on what you find as the average weekly wage. And I've tried calculating this out to a month of Sundays, and I get a different number almost every time. They would like this remanded for the purpose of vocational rehabilitation. They concede that the claimant began to lose time March 7th, 2007. 120 days after that would put us at July 5th, 2007. That's when a vocational plan should have been filed with the commission. They failed to comply with this rule, section 7110.10, and failed to initiate any vocational assessment until July 7th, 2007. Until the second half of 2011. On March 2nd, 2011, we had Mr. Belmonte evaluate Mr. McGinnis, and he opined that eventually he was permanently and totally disabled. This wasn't a benevolent employer who wanted to assist the petitioner in finding work. This was an employer who hired Mr. Stephan to opine that the petitioner could work. His report was made only to rebut Belmonte's decision. It wasn't until March 23rd, 2011, four years after they were obligated to file their vote plan, that they had the petitioner evaluated. Not until the trial began did they even state, we want to now do vocational rehabilitation. There was a four-year hiatus with the employer as far as VOC is concerned, and then at the last minute, they want a vocational assessment. So Belmonte recommended vocational testing because he had issues regarding my client's literacy, and it wasn't until October 2011 that they started to test him. Now, he tests out at basically the fourth grade level in reading, 3rd.8th level in math, and Respondent says, well, we can help him get his GED and we'll get him a job. You follow that logic. Why not take our grade school children, and after they complete the fourth grade, just move them right, do a GED, move them right on to high school. My client doesn't have a computer. He couldn't apply for jobs with a computer. He doesn't read. His wife drives him to the job sites so that he can learn how to get there because he can't read the street signs. So before the petitioners reach maximum medical improvement, he's got a five-pound restriction, no transferable skills, and Belmonte did opine that considering his age, limited education, narrow work experience, lack of transferability of skills, his disability is total. The appellant says with a little bit of help from our friends, he could be employable, yet they never even bothered to do a labor market survey. I'm not going to go into my calculations. They're covered in my brief, and I thank you for your time. Thank you, counsel. All right. So thank you, Mr. Hannigan. You know, as Mr. Hannigan said, the records from after the injury are more detailed than those from before the injury, but, of course, the employer didn't know in advance what day the petitioner would be injured on, so I don't think there's anything sinister in that. After the injury, they kept track of what he was doing, you know, and they kept track in terms of when he worked and what he did, et cetera, because in that time after December 9th, 2006 until February 17th, 2007, he was on light duty. So it was a different category of activity that he was doing. They call it heal time. But, yeah, they keep elaborate records of what somebody does when they're on heal time, more so than they do before they're injured on their regular duties. So and as to the penalties argument, yes, we've had a disagreement here this morning about the average weekly wage, which also implies that there is a reasonable disagreement as to what was owed on the temporary partial, which then implies that the payments that the employer made to resolve this issue on a provisional basis were reasonable, not vexatious, and that the respondent employer was not carrying on frivolous litigation for the purpose of delay. There's a real issue as to the amount of temporary partial disability benefits due. So the 19K penalties and the fee should have been not awarded by the commission, should be reversed by this court. Thank you. Can I make a question? The commission found that you owe temporary partial disability benefits for the period from July the 19th, 2007, through December the 6th, 2007. When did you make your first payment of temporary partial disability payments? I think the payments were made a couple years later. Two years after? Two years. I think that's correct. And they made demands on you throughout that period of time. Yes. The employer was providing him earnings for 24 hours per week, which is two-thirds of the 32 that he normally would have got, according to his record, if he had not been on 19K. So in that sense, they were making up two-thirds of his income. Okay. Thank you, counsel. Both arguments in this matter will be taken under advisement. This position shall issue.